**IN RE: J. Michael EAKIN, Justice of the Supreme Court of Pennsylvania**

**No. 13 JD 15**

Court of Judicial Discipline of Pennsylvania.

March 24, 2016

gaming. Petitioner's Brief at 46.

Francis J. Puskas, II, Deputy Chief Counsel, Judicial Conduct Board

James P. Kleman, Jr., Deputy Counsel

Elizabeth A. Flaherty, Deputy Counsel

William C. Costopoulos, Esquire

Before: Colville, P.J., Mullen, Panella, Shrager, Barton, and Hardaway, JJ.

PER CURIAM

## I. INTRODUCTION

History of the Case

The Judicial Conduct Board (Board) filed a Complaint with this Court on December 8, 2015 against J. Michael Eakin (Respondent), then a Justice of the Pennsylvania Supreme Court. The charges were founded upon allegations that the Respondent had participated in the exchange of e-mails with friends and professional acquaintances which were insensitive and contained inappropriate references to matters involving gender, race, sexual orientation, and ethnicity.

The Complaint consisted of four counts which charged the Respondent as follows:

1. Violation of Canon 2A of the former Code of Judicial Conduct, *Judges Should Avoid Impropriety and the Appearance of Impropriety In All of Their Activities* (Count 1). Canon 2A provided:

 Judges should respect and comply with the law and should conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the Judiciary.

2. Violation of Canon 5A of the former Code of Judicial Conduct, *Judges Should Regulate Their Extra–Judicial Activities to Minimize the Risk of Conflict with Their Judicial Duties* (Count 2). Canon 5A provided:

 **Avocational Activities.** Judges may write, lecture, teach, and speak on non-legal subjects, and engage in the arts, sports, and other social and recreational activities, if such avocational activities do not detract from the dignity of their office or interfere with the performance of their judicial duties.

3. Violations of Article V, Section 17(b) of the Pennsylvania Constitution, due to each of the violations expressed in Counts 1 and 2 (Counts 3(a) & (b), respectively). Article V, Section 17, *Prohibited Activities,* in subsection (b), provides in pertinent part:

 Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

4. Violation of Article V, Section 18(d)(1) of the Pennsylvania Constitution (Count 4). Article V, Section 18, *Suspension, Removal, Discipline and Other Sanctions,* in subsection (d)(1), provides in pertinent part:

 (d) A justice, judge or justice of the peace shall be subject to disciplinary action pursuant to this section as follows:

 (1) A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for ... violation of section seventeen of this article; misconduct in office; ... conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court ....

The Respondent filed an Answer to the Complaint on December 16, 2015. In his Answer, as well as his testimony at a hearing held on December 21, 2015, the Respondent denied having opened or read many of the e-mails that were sent to him

and which the Board could not prove were opened by him. The Board maintained that it was able to prove that the Respondent opened (1) those e-mails or e-mail threads wherein the e-mail or e-mail thread indicated that Respondent replied to or forwarded the e-mail, or (2) e-mails, as described in Respondent's deposition or testimony in court, that Respondent remembered seeing all or part of the content thereof.

In accordance with a per curiam order entered on December 22, 2015, the Respondent was suspended from his judicial and administrative responsibilities pending further Order of Court.[1]

Trial was scheduled for March 29, 2016. There were numerous motions filed by the parties which were addressed by the Court.

On March 15, 2016, the Respondent resigned his position.

On March 17, 2016, the Board and the Respondent filed Stipulations of Fact in Lieu of Trial pursuant to C.J.D.R.P. No. 502(D)(1) and a Waiver of Right to Trial.

Authority and Jurisdiction of the Court of Judicial Discipline

Section 18 of the Pennsylvania Constitution makes clear that the Court of Judicial Discipline has the limited jurisdiction and power to address a single subject matter; to review and decide formal disciplinary charges filed by the Judicial Conduct Board against a judicial officer. *See In re Bruno*, 627 Pa. 505, 101 A.3d 635, 661–662 (2014); PA. CONST. art. V, § 18(b)–(d). The constitutional amendment of 1993 establishing this Court provides specific instructions for the conduct of proceedings before this Court:

The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

PA. CONST. art. V, § 18(b)(5).

■ Clear and convincing evidence is defined as evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989).

■ The Court of Judicial Discipline has the authority to "order removal from office, suspension, censure or other discipline" of judicial officers. *In re Bruno*, 101 A.3d at 661.

Although the Respondent no longer holds office, our jurisdiction remains unchanged. Once a judicial disciplinary action has been instituted, authority over the disciplinary proceedings does not terminate until a final order and decision is rendered. This policy has been followed in a number of judicial discipline cases, one of the more recent being *In re Ciavarella*, 108 A.3d 983, 987 (Pa.Ct.Jud.Disc. 2014). In *In re Melograne*, 571 Pa. 490, 812 A.2d 1164 (2002), our Supreme Court explained the rationale for our authority to proceed with a judicial discipline matter, even after the judicial officer has left office, whether voluntary or not:

The Court of Judicial Discipline exists to police the conduct of the judiciary and assure the public of the integrity of this branch of government ... Thus, we ... hold that the Court of Judicial Discipline has the power to sanction misbehaving judicial officers, regardless of whether

---

1. The Court of Judicial Discipline is empowered to order the interim suspension, with or without pay, of any jurist "against whom formal charges have been filed ... by the board ...." PA. CONST. art. V, § 18(d)(2).

they are in office during the pendency of disciplinary proceedings.

812 A.2d at 1167 n. 2.

As stated above, the Board and the Respondent have filed Stipulations of Fact in Lieu of Trial pursuant to C.J.D.R.P. No. 502(D)(1) and a Waiver of Right to Trial. Rule 502 provides:

**Rule 502. Trial. Stipulations of Fact. Conclusions of Law. Withdrawal of Complaints or Withdrawal of Counts.**

. . .

(D) Stipulations of Fact.

(1) In lieu of a trial, the parties may submit to the Court stipulations as to all facts necessary to a decision of the issues in the case. The stipulations shall be binding upon the parties and may be adopted by the Court as the facts of the case upon which a decision shall be rendered. When submitted, the stipulations shall be accompanied by a signed waiver of any right to trial granted under the Constitution and the Rules of this Court.

(2) The parties may submit stipulations as to issues of fact, but which do not resolve all relevant issues in the case. In this case, the parties shall be bound by the stipulations and the Court may adopt them and proceed to trial on all remaining factual issues.

(3) In the event the Court rejects stipulations submitted under subsection (1) or (2) above, the Court shall schedule a conference to determine whether the parties shall be afforded the opportunity to submit revised stipulations or whether the case should proceed to trial.

██ Two principles are firmly established in cases involving judicial discipline. First, in all cases, this Court is required to make an independent evaluation of the evidence, whether stipulated to or determined after a hearing, in order to decide whether the allegations have been proven by clear and convincing evidence, and whether the conduct in issue violates the Pennsylvania Constitution or the Canons.[2] This review must be conducted on a case-by-case basis. *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255, 1258 (2007).[3]

██ Secondly, where the parties enter into stipulations of fact which are accepted by the Court, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced *clear and convincing* evidence. *See e.g. In re Zelloe*, 686 A.2d 1034 (D.C. 1996)(attorney discipline); *In re Wilfong*, 234 W.Va. 394, 765 S.E.2d 283, 291 (2014);

In addition to factual stipulations, the parties have also stipulated to the authenticity and admissibility of all exhibits set forth in their respective pre-trial memoranda, filed of record, and to the authenticity and admissibility of all exhibits entered of record during the hearing held on December 21, 2015, also filed of record.

The parties have additionally stipulated to the authenticity and admissibility of the following, all of which have been filed and are contained in the record:

(1) the self-report letter to the Board drafted by the Respondent on October 17, 2014;

---

**2.** This principle is well settled in every jurisdiction. *See e.g. In re Murphy*, 181 So.3d 1169 (Fl. 2015); *In re Marshall*, 8 N.Y.3d 741, 840 N.Y.S.2d 561, 872 N.E.2d 247 (2007); *In re Hill*, 368 N.C. 410, 778 S.E.2d 64 (2015).

**3.** Another justification for this review is our obligation to develop a body of law that will provide judges with guidance and direction as to the conduct which may form the basis for the imposition of sanctions under our Constitution. *See In re Timbers*, 668 A.2d 304, 305 (Pa.Ct.Jud.Disc. 1995).

(2) the Notice of Full Investigation (NOFI) issued by the Board to the Respondent on October 27, 2014;

(3) the Respondent's November 5, 2014 response to the Board's NOFI;

(4) three reports of interview with the Respondent written by investigator Jack Harlacker dated October 17, 20, and 24, 2014; and

(5) the deposition of the Respondent conducted by Board counsel on October 20, 2015.

Also on March 17, 2016, the parties filed the following:

• FORMER JUSTICE J. MICHAEL EAKIN'S WAIVER OF RIGHTS— which was filed in conformity with C.J.D.R.P. Nos. 421 and 502;

• FORMER JUSTICE J. MICHAEL EAKIN'S WAIVER OF PRESENCE AT FINAL PRE–TRIAL CONFERENCE; and

• The Board's MOTION TO WITHDRAW COUNT 4 OF THE BOARD COMPLAINT PURSUANT TO C.J.D.R.P. No. 502(F).

This Court accepts those stipulations of fact in pertinent part, recited below, as the facts necessary for the determination of this case. Since the Constitution requires that final actions of the Court must be approved by a majority vote of the members of the Court, PA. CONST. art. V, § 18(b)(4), the Stipulations submitted by the parties have been reviewed and this Decision is rendered by the full Court. *See In re Whittaker*, 948 A.2d 279, 287 (Pa.Ct. Jud.Disc. 2008).

## II. FINDINGS OF FACT

1. The Judicial Conduct Board is empowered by Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania to file formal charges alleging misconduct on the part of a justice, judge or magisterial district judge, and to present the case in support of the formal charges before the Pennsylvania Court of Judicial Discipline.

2. From approximately January 2, 2002, until March 15, 2016, the Respondent served continuously as a duly elected Justice of the Supreme Court of Pennsylvania, with a principal office at 4720 Old Gettysburg Road, Suite 405, Mechanicsburg, PA.

 a. Prior to his service as a Justice of the Supreme Court, the Respondent served as a Judge of the Superior Court of Pennsylvania.

 b. The Judicial Conduct Board has not produced any evidence that the Respondent, in his written judicial opinions, ever demonstrated any overt bias due to the race, gender, ethnicity, or sexual orientation of a litigant or witness.

 c. The Judicial Conduct Board has not produced any evidence that the Respondent has been charged with any criminal offense or any form of corruption.

3. The Respondent resigned his position as a Justice on March 15, 2016.

4. As a Justice of the Supreme Court, the Respondent was at all times relevant hereto, subject to all the duties and responsibilities imposed on him by the Constitution of the Commonwealth of Pennsylvania.

5. Until July 1, 2014, and during all times relevant hereto, the Respondent was subject to all the duties and responsibilities imposed on him by the former Code of Judicial Conduct, which was revised in 2014.

6. During his tenure with the Pennsylvania Supreme Court, the Respondent was provided with Commonwealth-issued computer hardware and other electronic

equipment capable of sending and receiving e-mail.

7. The Respondent utilized this Commonwealth-issued computer equipment to send and receive e-mail from a personal, *i.e.*, non-court provided, web-based e-mail address, at yahoo and identified as wap092001. This e-mail account is referred to as the "John Smith" e-mail address.

 a. This e-mail address does not identify the Respondent by his name or judicial title.

 b. This e-mail address identified the Respondent as "John Smith."

 c. People who sent e-mail to the Respondent at this e-mail address knew that it was, in fact, the Respondent's personal e-mail address.

 d. People who received e-mail from the Respondent from this e-mail address knew that it was, in fact, the Respondent's personal e-mail address.

 e. The Respondent also has a court-provided public e-mail address, "JusticeEakin@pacourts.us."

8. One of the persons who exchanged, *i.e.*, sent and received, e-mails with the Respondent at the "John Smith" e-mail address was Jeffrey Baxter, Esquire, a Deputy Attorney General (DAG) employed by the Office of Attorney General (OAG) in the OAG's Pittsburgh field office.

 a. The Respondent and DAG Baxter had a long friendship, which started after the Respondent hired DAG Baxter as an assistant district attorney when the Respondent was the District Attorney of Cumberland County.

9. Over the years that he was a Supreme Court Justice, the Respondent, DAG Baxter, and a group of several other men went on golfing vacations together, played fantasy football, and were engaged in other social activities together (the "golfing group").

 a. From 2008–2012, the Respondent used his "John Smith" e-mail address to communicate with DAG Baxter and the other individuals who were part of the golfing group.

 b. The majority of e-mails exchanged between the Respondent, DAG Baxter, and the golfing group related solely to social activities that took place among and between them.

 c. As set forth more fully below, the Respondent sent to DAG Baxter or members of the golfing group a joke that contained a semi-nude photograph of a woman and e-mails containing statements that were inappropriate and chauvinistic.

 d. As set forth more fully below, the Respondent engaged in an exchange with DAG Baxter that contained inappropriate sexual innuendo about specific women known to both men.

 e. On different occasions, the Respondent received and sent e-mails to others who utilized a government e-mail server or were using government supplied equipment.

10. None of the e-mails set forth more fully below discuss or were related to matters pending before the Supreme Court or involve the business of the Judiciary of Pennsylvania.

11. From approximately 2008–2012, the Respondent, together with a large number of other individuals (male and sometimes female), including persons employed by the OAG, received "blast" e-mails from Terrance McGowan, Esquire, a Harrisburg-area criminal defense attorney.

 a. Attorney McGowan is a friend of the Respondent and has been on one or two out-of-state fishing vacations with him.

b. The Respondent's personal e-mail address had formerly identified him by his last name and title, but, as a result of the content of Attorney McGowan's e-mails, he changed his personal e-mail address to the yahoo account as described above, wap092001, and listed his name at that address as "John Smith."

12. A number of the e-mails sent by the Respondent from his "John Smith" e-mail address and received at that e-mail address from the golfing group and Attorney McGowan between 2008 and 2012 included content that someone of reasonable sensitivities would find offensive.

 a. With the exception of the filing of, or responding to, petitions for allowance of appeal, all of which were denied by the Supreme Court, neither Attorney McGowan nor any member of the golfing group who was an attorney appeared before the Respondent during the time that he exchanged e-mails with them.

13. The subject of the content of the e-mails sent from, and received by, the Respondent at his "John Smith" e-mail address first arose in October 2014.

14. By letter to the Board dated October 17, 2014, the Respondent reported the substance of the argument between himself and former Justice McCaffery, and the revelations to the media about his "John Smith" e-mails. That same day, the Respondent also made his letter to the Board public when he released it to the media along with a Press Release.

15. Based on the Respondent's October 17, 2014 self-report to the Board, the Board opened investigation No. 2014–647.

 a. The Board later received a second request for investigation of the Respondent's e-mail conduct from a private citizen. That request was opened as investigation No. 2014–650.

16. On October 17, 2014, after receiving the Respondent's self-report, the Board's investigator interviewed the Respondent.

 a. The Board's investigator conducted two further interviews of the Respondent on October 20 and 24, 2014.

 b. The Board also authorized the issuance of a notice of full investigation to the Respondent and the Board's counsel subsequently issued such notice.

 c. The Respondent provided a timely written response to the notice of full investigation.

17. On October 24, 2014, by personal service, the Board's counsel issued subpoena *duces tecum* No. 2014–048 to Attorney General Kathleen Kane (AG Kane).

18. Previously, on October 9, 2014, in connection with another investigation, the Board's counsel, by personal service, issued subpoena *duces tecum* No. 2014–044 to AG Kane.

19. On November 4, 2014, OAG First Deputy Bruce Beemer (FD Beemer) contacted Board Chief Counsel Robert A. Graci and informed him that he had material for the Board's review.

20. The Board's investigator obtained the material provided by FD Beemer on November 4, 2014; because the Board's offices were closed that day for Election Day, the material received from FD Beemer was marked received on November 5, 2014, the following business day.

21. The material received by the Board on November 5, 2014, consisted of one disc containing 48 Microsoft Outlook files (the November 5, 2014 disc),

which comprised four e-mails that were sent by the Respondent from his "John Smith" e-mail address, and 44 e-mails (inclusive of several duplicates or responses) that were received by the Respondent at his "John Smith" e-mail address; and printouts of the 48 e-mails contained on the disc.

a. The e-mails received by the Respondent that were contained on the November 5, 2014 disc were sent to him partially by Attorney McGowan as part of his "blast" e-mail practice and partially by members of the golfing group, including DAG Baxter.

22. Some of the e-mails sent by the Respondent on the November 5, 2014 disc contained the following content:

a. An e-mail bearing the subject line "Why I failed 4th Grade," sent Monday, March 29, 2010.

The e-mail contains a photograph of an elementary school teacher in the midst of a group of school-aged children at desks; the teacher is holding open a book bearing the words "Grammar 101." A word balloon from the teacher asks, "So—an abstract noun is something you can think of but not touch...Can you give me two examples..." A student responds "Your Tits!"

b. A thread of e-mails bearing the subject line "Personal Note." The Respondent did not send the e-mail that initiated the thread, which contained a joke which included a series of pictures of women in increasing levels of undress, culminating in a picture of a topless woman in a hot tub. However, the Respondent sent three e-mails in the discussion that ensued following the joke, which referenced the attendance of the golfing group at a Myrtle Beach strip club.

23. The content of the e-mails received by the Respondent included:

- photographs of nude or semi-nude women
- video clips of comedic skits that had sexually-suggestive themes,
- photographic slide shows of faux "motivational posters" and
- other pictures that contained nude or semi-nude women and jokes based on negative social and gender stereotypes.

A more detailed description of the e-mails the Respondent received that are contained on the November 5, 2014 disc is contained on Addendum A.

24. On November 20, 2014, the Board's counsel received an e-mail from FD Beemer providing access to an "electronic vault" of e-mails stored on the OAG's servers.

25. This "electronic vault" contained e-mails exchanged among the then-Justices of the Supreme Court and OAG personnel from the Justices' official "pacourts.us" e-mail addresses.

26. Pertaining to the Respondent, the "electronic vault" contained 415 Microsoft Outlook files that constituted e-mails that were exchanged between the Respondent at Justice.Eakin@ pacourts.us, his official court-provided e-mail address, and OAG staff.

a. The e-mails sent and received by the Respondent with OAG staff at Justice.Eakin@pacourts.us were either proper professional communications or limited social exchanges that did not contain content that a person of reasonable sensibilities would find offensive.

b. The only e-mails that the Respondent received at JusticeEakin@pacourts.us that contained content that a person of reasonable sensibilities would find

offensive were some "blast" e-mails that were sent to him and others, including OAG staff, by former Justice McCaffery.

c. A more detailed description of the e-mails the Respondent received from former Justice McCaffery is contained in Addendum B.

d. None of the "blast" e-mails sent by Justice McCaffery that were received by the Respondent at his Justice. Eakin@pacourts.us e-mail address contained nudity or pornography.

e. The Respondent received the aforementioned e-mails more than four years before the complaints against him at 2014–647 and 2014–650 were opened by the Board in October 2014.

27. The "electronic vault" access provided to Board staff on November 20, 2014, did not contain any e-mails from the Respondent's "John Smith" account.

28. Other than the 415 Justice.Eakin@ pacourts.us e-mails that were contained in the "electronic vault" and the 48 e-mails that were contained on the November 5, 2014 disc, the Board was not provided with any other e-mails exchanged among the Respondent and OAG staff, despite the existence of subpoenas 2014–044 and 2014–048.

29. Based on the lack of production of any other e-mails exchanged among the Respondent and OAG staff, Board staff concluded that it was in possession of all of the e-mails exchanged among the Respondent and OAG staff that involved the material requested by subpoena Nos. 2014–044 and 2014–048, i.e., any and all e-mails which contained pornographic images, sexually explicit, sexually suggestive or sexually-charged material, or racially-charged jokes, or other improper content, or are titled to indicate they contain such content be-tween the dates of January 1, 2008, and December 31, 2012.

30. Board counsel presented the Eakin matter to the Board at its December 8, 2014 meeting, and the Board voted to dismiss complaint Nos. 2014–647 and 2014–650 which were then pending against the Respondent.

31. Board counsel informed the Respondent of the Board's decision to dismiss the complaints by letter on December 17, 2014.

32. Despite the Board's prior subpoenas, OAG did not inform the Board of its possession of any e-mails from the Respondent's "John Smith" e-mail address beyond the 48 Outlook files received by the Board on November 5, 2014, and did not provide them to the Board until September 28, 2015.

33. Not long afterwards, Attorney General Kane, on her own or through staff, stated that the Respondent had sent and received "racial, misogynistic pornography" on state computers.

34. Thereafter, for the first time since November 2014, AG Kane sent a letter and enclosed disc, with the words "John Smith" written on the disc on September 28, 2015, to the Honorable Jayne Duncan, Chair of the Board, carbon copied to Chief Justice Thomas G. Saylor of the Supreme Court of Pennsylvania.

35. When opened on a computer, the disc enclosed with AG Kane's letter contained a general file folder entitled "John Smith;" the "John Smith" file folder contained two first-level subfolders entitled:

- "2008–2012", which contained two second level subfolders:
 - "From wap092001"
 - "To wap092001"

- "2012–present", which contained two second level subfolders:
 - "From wap09201"
 - "To wap092001."

36. The second-level subfolders "From wap092001" contained Outlook files representing e-mails <u>sent by</u> the Respondent from his "John Smith" e-mail address for the time period that was used as the title of the second-level file folder, *i.e.*, 2008–2012 and 2012–Present.

37. The second-level subfolders "To wap092001" contained Outlook files representing e-mails <u>received by</u> the Respondent at his "John Smith" e-mail address for the time period that was used as the title of the second-level file folder, *i.e.*, 2008–2012 and 2012–Present.

38. After the Board received AG Kane's letter and the enclosed disc, Board counsel opened investigation No. 2015–601 into the Respondent's conduct of sending and receiving the e-mails in question.

39. Based on their review of the disc, Board staff concluded that the September 28, 2015 disc contained e-mails that had not been seen by any Board staff member during the 2014 investigation of the Respondent.

40. Because of discrepancies in the information received from the OAG, Board counsel issued subpoena No. 2015–019 to AG Kane, ordering her to produce the following by October 16, 2015:

a. Printed copies of all e-mails and printed copies of any attachments to those e-mails (if same are capable of reproduction by printing) sent to, received from, exchanged, forwarded or otherwise disseminated from any e-mail address used by or known to be used by any current or former member of the Pennsylvania Judiciary, including, but not limited to, Justice J. Michael Eakin, that were sent to, received from, exchanged, forwarded, or otherwise disseminated between and among these jurists and any current or former employee of the Office of Attorney General (OAG), between the dates of January 1, 2008 and the present, which contain any of the following: pornographic images; sexually-charged or sexually-suggestive material; material that has been described publicly by the Attorney General as "misogynistic;" material that has been described publically by the Attorney General as "racist" or "racial;" material that is offensive to currently and commonly-held notions of decency; or other improper content; or are titled to indicate that they contain such content, showing any and all senders, recipients, including but not limited to direct recipients, Cc'd recipients or Bcc'd recipients, dates, contents, and any and all information relating thereto, whether or not the e-mail and its content were opened by the recipient.

b. Electronic copies of any and all of the e-mails and the attachments to the e-mails described above (identifying the e-mail to which they are attached).

41. On October 15, 2015, OAG sent a letter to Chief Counsel Graci with two discs, the first disc contained a single file entitled "PA_Supreme_Court_Review_10–14–2015.pst," and a copy of the November 5, 2014 disc containing the 48 Outlook files previously viewed by the Board staff in the 2014 investigation; the second disc also contained 48 PDF files of the text (and some embedded attachments) of the 48 Outlook files.

a. Also included with the letter and two discs were four reams of printed e-mails titled as follows:

(1) December 5, 2008—December 29, 2008 NonSexual Forwards;

(2) December 30, 2008—January 16, 2009 NonSexual Forwards;

(3) January 16, 2009—February 6, 2009 Non–Sexual Forwards; and

(4) 2008–2012 Potential Duplicates Non–Sexual Forwards.

42. When opened with an "Outlook viewer" program, the "PA_Supreme_Court_Review_10–14–2015.pst" file contained two first-level file folders entitled:

- "2008–2012 e-mails" which contained two second level folders:
 - "Non-sexual Forwards" and
 - "Sexual Forwards."
- "2013–2014 e-mails" which contained two second level folders:
 - "Non-sexual Forwards" and
 - "Sexual Forwards."

43. The "2008–2012 e-mails" first-level file folder also had a third-level file folder entitled "Potential Duplicates."

44. Contained on the September 28, 2015 disc or the "PA_Supreme_Court_Review_10–14–2014.pst" file are e-mails that were sent by the Respondent from his "John Smith" e-mail address to the golfing group, either to individuals in the group or as a group, during the time period of 2008–2012 and 2012–2014. A number of these e-mails sent by the Respondent contained subject matter that involved:

- nudity
- gender stereotypes
- ethnic stereotypes.

A more detailed description of the e-mails received by the Respondent which were contained on this disc is contained on Addendum C.

45. Contained on the September 28, 2015 disc or the "PA_Supreme_Court_Review_10–14–2014.pst" file were e-mails received by the Respondent at his "John Smith" e-mail from members of the golfing group during the time period of 2008–2012 and 2012–2014. A number of the e-mails received by the Respondent from the golfing group contained:

- pictures of nude women;
- sexually-suggestive themes;
- gender stereotypes;
- homophobic content;
- socioeconomic stereotypes;
- violence towards women;
- racial humor;
- ethnically-based humor; and
- stereotypes of religious groups.

A more detailed description of the e-mails received by the Respondent which were contained on this disc is contained on Addendum D.

46. Contained on the September 28, 2015 disc or the "PA_Supreme_Court_Review_10–14–2014.pst" file were e-mails received by the Respondent at his "John Smith" e-mail from Attorney McGowan in his "blast e-mails," during the time period of 2008–2012 and 2012–2014. A number of the e-mails received by the Respondent from Attorney McGowan contained:

- pictures of nude women;
- sexually-suggestive themes;
- gender stereotypes;
- homophobic content;
- socioeconomic stereotypes;
- violence towards women;
- racial humor;
- ethnically-based humor; and
- stereotypes of religious groups.

A more detailed description of the e-mails sent by the Respondent which were contained on this disc is contained on Addendum E.

47. After receiving the aforementioned e-mails on October 15, 2015, Board counsel sought to achieve written confirmation from the OAG that it, in fact, had all of the e-mails pertaining to the Respondent from his "John Smith" e-mail address.

48. Board counsel deposed the Respondent at its offices on October 20, 2015.

49. On November 10, 2015, Board staff obtained written confirmation from the OAG IT Department that it had all of the e-mails pertaining to the Respondent's "John Smith" e-mail address and his "pacourts.us" e-mail address.

50. Pursuant to this Court's Order of December 10, 2015, the Board served a subpoena issued by this Court to AG Kane that required her to search for and to provide any e-mails sent to or from any e-mail account associated with the Respondent that contained material that was sexually explicit, misogynistic, ethnically insensitive, racist or homophobic.

 a. On February 12, 2016, AG Kane responded to the subpoena by providing two compact discs containing electronic copies of the same e-mails that she had previously provided to the Board.

 b. Based on AG Kane's compliance with the subpoena and the prior certification, Board counsel concluded that AG Kane did not have any other e-mails sent to or from the Respondent that had not already been provided to the Board.

### III. DISCUSSION

We begin this discussion with stating what we think is an obvious, yet vital proposition: Our judicial system should stand as the symbol of fairness and justice, and of equal protection dispensed to every citizen.

We find that the Board has established by clear and convincing evidence that Respondent's conduct constituted a violation of Canon 2A of the former Code of Judicial Conduct—failure to conduct himself in a manner that promotes confidence in the integrity and impartiality of the judiciary. This version of Canon 2 [4] was in effect at the time of the occurrences described in the stipulated findings. At the relevant time period, Canon 2A provided:

**Judges Should Avoid Impropriety and the Appearance of Impropriety In All of Their Activities.**

A. Judges should respect and comply with the law and should conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the Judiciary.

■ The application of former Canon 2, and whether it applies to the official functions of a judge or also encompasses non-official responsibilities (typically referred to as "off-bench conduct") has been debated and discussed for a long time. In *Matter of Larsen*, 532 Pa. 326, 616 A.2d 529 (1992), the Pennsylvania Supreme Court, by adopting the Report of the Judicial Inquiry and Review Board, held that off-bench conduct of judges was relevant to actions in judicial discipline under this Canon.

*"The place of justice is a hallowed place; and therefore not only the bench but the*

---

4. In 2014, former Canon 2A was substantially incorporated into new Rule 1.2 of Canon 1, which states:

 A judge shall act at all times in a manner that promotes public confidence in the in-dependence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

*foot-pace and precincts, and purprise thereof ought to be preserved without scandal and corruption, * * *" So spoke Sir Francis Bacon in the 16th Century.* For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest. A cloud of witnesses testify that "justice must not only be done, it must be seen to be done." Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy.

616 A.2d at 578 (quoting *In re Greenberg*, 442 Pa. 411, 280 A.2d 370, 372 (1971).

Canon 2 has traditionally been directed at conduct which would impugn or detract from the "integrity and impartiality" of the judiciary.[5] *In re Cicchetti*, 697 A.2d 297, 313 (Pa.Ct.Jud.Disc. 1997). As stated above, the Pennsylvania Supreme Court, in *Matter of Larsen*, 532 Pa. 326, 616 A.2d 529 (1992), rejected the notion that the concern over the "appearance of impropriety" related only to a judge's official conduct, and instead adopted the view that a judge could be disciplined for personal conduct, unrelated to judicial responsibilities, with the focus being "on conduct which 'legitimately reflect[s] upon the ju-

rist's professional integrity.'" *Id.* at 582. The *Larsen* decision concluded that off-bench conduct was reviewable, and the appropriate inquiry was "whether and to what extent particular conduct may constitute censurable judicial misconduct." *Id.* at 578 (emphasis omitted).

In our earlier decisions, we also held that former Canon 2 was directed at all types of conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially or fairly. *In re Smith*, 687 A.2d 1229, 1240 (Pa.Ct. Jud.Disc. 1996).

The focus of former Canon 2 was then narrowed to review only the "judicial decision-making" functions of a judge. In *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000), the Supreme Court stated that former Canon 2 addressed only "the judicial decision-making process" and allegations directed at conduct "independent of ... decision-making duties" were not reviewable under this canon. *Id.* at 441.[6] *See also In re Harrington*, 587 Pa. 407, 899 A.2d 1120 (2006).

In 2013, the Supreme Court overruled the earlier decisions in *Cicchetti* and *Harrington*, and held that conduct of a judicial officer, whether or not occurring within the judicial decision-making process, was

---

**5.** Such concerns are universal to the judicial system in our Commonwealth, our nation, and beyond. This fundamental tenet has been stated that:

> We form a particular group in the community. We comprise a select part of an honourable profession. We are entrusted, day after day, with the exercise of considerable power. Its exercise has dramatic effects upon the lives and fortunes of those who come before us. Citizens cannot be sure that they or their fortunes will not someday depend upon our judgment. They will not wish such power to be reposed in anyone whose honesty, ability, or personal standards are questionable.

Statement of Principles of Judicial Ethics for the Scottish Judiciary, 2015, (quoting Judicial Ethics in Australia, 2d ed. (1997) at 9 (quoting Mr. Justice Thomas, a Judge of the Supreme Court of Queensland)).

**6.** As explained by Elizabeth A. Flaherty, Esq., Deputy Counsel to the Board, in her excellent article, Impropriety and the Appearance of Impropriety: What to Expect in Future Judicial Discipline Cases, the analysis under former Canon 2 changed, for the time being, and "both Canon 1 and Canon 2 were inexplicably linked to the judicial decision-making process."

again open for review as to whether it affected the integrity of the judiciary. *In re Carney*, 621 Pa. 476, 79 A.3d 490, 507 (2013). However, for due process considerations, the *Carney* decision was made prospective only, in order for judicial officers to have notice as to "what type of conduct is prohibited . . . ." *Id.* at 508.

The distinction between the pre- and post-*Carney* standard of review is inconsequential in this case because the e-mails which this Court finds relevant to our analysis under Canon 2 were all sent by the Respondent on his Commonwealth issued computer equipment. See Finding of Fact No. 7. Specifically, the Respondent used his government supplied equipment to send the e-mails which contained subject matter that involved nudity, gender stereotypes, and ethnic stereotypes. See Finding of Fact Nos. 22 & 44. Additionally, the Respondent conversed in these e-mails in a sexually suggestive manner about employees in his judicial office.

Not only did the Respondent use his government supplied equipment to send and receive these e-mails, he also participated with others who were using their government supplied computers and e-mail servers. See Findings of Fact Nos. 8 & 9; Eakin Deposition, 10–20–15 at 27–18.

Also, we note that Respondent's position as a justice of the Supreme Court conferred upon him not only the duty to decide cases, but also significant administrative responsibilities for our justice system. Thus, Respondent's actions, although they occurred outside of deciding cases or holding sessions of court, still can be fairly considered to be "on-bench" conduct. This further renders unnecessary consideration whether the narrowing, and later broadening, of conduct covered by Canon 2A is applicable to Respondent's conduct. *See In re Bruno*, 627 Pa. 505, 101 A.3d 635, 663 (2014) ("In the Supreme Court 'shall be

reposed the supreme judicial power of the Commonwealth. . . .' [and] 'general supervisory and administrative authority over all courts. . . .' PA. CONST., art. V, § 10(a)").

For these reasons, we find that regardless of the standard of official actions or off-bench conduct, Canon 2A applies to the e-mails referenced in the Findings of Fact.

█ The Court finds the following three e-mails to be strikingly egregious in light of the fact that the Respondent was talking about his judicial employees:

An email bearing the subject line "Re: Holiday Party," sent Thursday, December 17, 2009, at 9:15 a.m.:

> This email constitutes a response by Justice Eakin to DAG Jeffrey Baxter's initiating email regarding his inability to attend Justice Eakin's annual Holiday Party. At the close of DAG Baxter's message, he asks Justice Eakin to "Slap Stoney's ass for me and wish him a Merry Christmas, Lubba's too if he shows up. And well, Janey's too and let me know how it was. Maybe next year we won't have the conflict and I can slap hers for myself."

> Justice Eakin responded, in part, "Will do."

Two emails bearing the subject line "Re: [L.] getting married," sent Monday, December 28, 2009, at 1:49 p.m. and 2:44 p.m., respectively.

> These emails constitute a sexually-suggestive thread/conversation between Justice Eakin and DAG Jeffrey Baxter about a woman who they both know that was employed by Justice Eakin at the time of the email thread/conversation.

Six emails bearing the subject line "Re: Myrtle next year" sent Thursday, June 18, 2009, between 8:45 a.m. and 10:21 a.m.

These emails constitute a thread/discussion between Justice Eakin and his golfing group.

Points in the thread/discussion became sexually suggestive. At one point in the exchange, Justice Eakin wrote the following:

"Being on the road—I just got this exchange—you guys sound like a bunch of women, worrying about offending and being misunderstood and falling all over each other thanking everyone and getting misty eyed! Jeezus, boys, is it a menstrual [sic] thing? The next thing we'll be splitting the check at Finn McCool[']s 'now you had the BLT and an iced tea, so you owe. . . .' Snap the hell out of it!!!

Everybody's great, everybody's in Bax, get the money up front and all of the rest of us will go. New Judge [B.] will find [out] a judge has to go out of state to see boobs. New Dad [S.] will go unless he knocks Momma up again. [S] can spend an extra hour in the OR and pay for all of us!!

I'm in. I've got a stake of fifty ones and a titty-deficit that needs cured."

A sexually-suggestive thread/discussion continued between Justice Eakin and DAG Jeffrey Baxter regarding two women known to both men. They question whom the women will be rooming with during their trip.

When viewed in light of the goals of former Canon 2A, it is clear that when these e-mails became public, the Respondent's conduct not only did not promote the public's confidence in the integrity and impartiality of the judiciary, but drastically damaged the reputation of the state judiciary.

Respondent's e-mails have been characterized in various terms. Whether labelled misogynistic, racially-biased, biased against national origin, or biased toward sexual orientation, they represent a list of topics which should give any jurist pause. The list also corresponds, in a number of instances, with categories protected by the laws of the United States and of our Commonwealth. Significantly, they could cause citizens to wonder whether their cases received unbiased consideration by Respondent, something that we find abhorrent to the principles to which Respondent has ostensibly dedicated his entire professional career. A reasonable inference that Respondent lacked the impartiality required of judges also fundamentally lessens public confidence in the judiciary. We acknowledge the context in which many of these communications occurred, Respondent's expectation that they would remain private, and that humor is often expressed in poor taste and rooted in the extreme. However, the pattern evidenced by the body of all of the emails demonstrated a misjudgment by Respondent, both in his understanding of how electronic communications work, as well as the substantive content of those communications.

Former Canon 2A was based upon the American Bar Association's *Model Code of Judicial Conduct*. The ABA's *Judicial Model Code* consisted of general principles called "Canons" which established broad frameworks of appropriate judicial conduct. Following its adoption by the ABA, the *Judicial Model Code* was enacted in forty-nine states and the District of Columbia. The *Judicial Model Code* was founded upon the admonition that judicial independence depends upon public confidence in the judicial system, "which in turn requires judges to engage at all times in conduct that is and appears to be appropriate and unbiased." Tobin A. Sparling, Keeping Up Appearances: The Constitutionality of the Model Code of Judicial Conduct's Prohibition of Extrajudicial Speech Creating the Appearance of Bias,

19 Geo. J. Legal Ethics 441, 451 (Spring 2006). Specifically,

> Section A of Canon 2 underlines the continuous nature of the foregoing duties, requiring the judge to "act *at all times* in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

*Id.* at 451.

Our judicial system should stand as the symbol of fairness and justice, and of equal protection dispensed to every citizen. The Respondent stipulated that he sent out e-mails which mocked minorities and placed women in submissive sexual stereotypes. When these e-mails became public, all the more probable since he was using government equipment, and, at times, judicial and government internet servers, it resulted in harsh criticism ranging from private citizens to community leaders to legal and governmental officials.[7] His actions were likewise widely reported in the news media both statewide and nationally. Based upon this history, we find that the Respondent's actions dramatically lessened public confidence in the integrity and impartiality of the entire Judiciary.[8]

Unlike the other branches of government, which at times must adhere to the wishes and demands of their constituents, the judicial branch holds the unique responsibility to administer justice to all. For this reason, although we do not doubt for a moment that the respondent never intended that his e-mails would become public, we nonetheless are seriously troubled by the negative light that the Respondent's actions have befallen upon the statewide judiciary.

█ Because it violated former Canon 2A, the same conduct was also an automatic, derivative violation of Article V, § 17(b) of the Pennsylvania Constitution which provides in part that; "Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." *See also In re Miller*, 759 A.2d 455 (Pa. Ct. Jud. Disc. 2000).

█ Having found that Respondent is subject to discipline for conduct which violates former Canon 2A as well as a violation of Article V, § 17(b) of the Pennsylvania Constitution, it is not strictly necessary to address the remaining Counts of the Complaint because they are based upon the same conduct as the violation of former Canon 2A.[9] As we stated in *In re Eagen*, 814 A.2d 304, 306–07 (Pa.Ct.Jud. Disc. 2002):

---

7. It is of no moment that Respondent intended the e-mails to be private. This Court has often dealt with conduct that was intended to be kept private as forming the basis for judicial misconduct. *See e.g. In re Berry*, 979 A.2d 991, 998–999 (Pa. Ct.Jud.Disc. 2009); *In re Strock*, 727 A.2d 653 (Pa. Ct.Jud.Disc. 1998); *In re Daghir*, 657 A.2d 1032 (Pa. Ct.Jud.Disc. 1995) (Decision on stipulated facts under C.J.D.R.P. No. 504 finding violation of Canon 2A).

8. While judicial disciplinary tribunals have had limited experience with inappropriate emails sent by jurists, they have resulted in findings of Canon 2A violations. See e.g. *In re: Complaint of Judicial Misconduct (Kozin-*

*ski)*, J.C. No. 03–08–90050 (June 5, 2009), Judicial Council of Third Circuit; *In re Complaint of Judicial Misconduct (Cebull)*, Nos. 12–90026 and 12–90032 (January 17, 2014), Judicial Council of Ninth Circuit.

9. The Board has requested authority from the Court to withdraw Count 4 of their Complaint. Count 4 is also based upon the same conduct as Count 1. Upon a review of the Respondent's stipulations as to the facts which prove by clear and convincing evidence that the Respondent violated former Canon 2A, and as well as our disposition herein, we find that the Board's Motion to Withdraw Count 4 is moot.

Unlike a criminal case in which the range of penalties is determined by the number of charges and the statutory sentence mandated for each offense upon which there is a finding of guilt, the scope of sanctions available to this Court is not so circumscribed. Any finding by this Court, that a judicial officer has violated the Constitution of Pennsylvania or the Code of Judicial Conduct subjects that judge to the full range of appropriate discipline. Furthermore, in exercising our discretion in imposing disciplinary sanction, we are guided not by the number of ways the Respondent's conduct has offended the Constitution or Code, but by the nature of the conduct itself and any mitigating or aggravating circumstances.

*See also In re Murphy*, 10 A.3d 932, 937 (Pa. Ct. Jud. Disc. 2010).

## IV. CONCLUSIONS OF LAW

1. The Respondent's conduct set out in the Findings of Fact constitutes a violation of former Canon 2A of the Code of Judicial Conduct.

2. The Respondent's conduct set out in the Findings of Fact, constitute a derivative violation of Article V, § 17(b) of the Pennsylvania Constitution.

3. The Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution, which provides:

(d) A justice, judge or justice of the peace shall be subject to disciplinary action pursuant to this section as follows:

(1) A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for ... violation of section 17 of this article; ... or conduct in violation of a canon or rule prescribed by the Supreme Court.

## V. SANCTIONS

Having found Respondent in violation of Canon 2A, and the derivative violation of PA. CONST. art. V, § 17(b), we turn to finding an appropriate sanction to address these violations. We trust that our discussion above conveys this court's disgust with, and disapproval of, the sordid and offensive communications giving rise to this case.

We note Respondent's arguments in mitigation, and the following factors which suggest tempering our sanction from that which might have been imposed after trial.[10] Respondent's conduct was not criminal,[11] nor did it prejudice the proper administration of justice.[12] The Board has submitted that this case involves the "appearance of impropriety," and has not alleged that judicial decisions were made for or influenced by improper reasons. We also acknowledge that Respondent has not contested the factual predicates of the case. Respondent also presented credible witnesses that his judicial opinions were not reflective of any of the biases expressed in any of the emails, but instead were decided, in each case, in accordance with the facts and law. Respondent's longtime judicial service was otherwise exem-

---

10. *See* **In re Eagen**, 814 A.2d at 306–07 (Any finding of a violation can result in full range of penalties up to and including removal from office).

11. *See e.g.* **In re Melvin**, —— A.3d —— (Pa.Ct. Jud.Disc. 2015) (sanction of removal); **In re Ciavarella**, 108 A.3d 983 (Pa.Ct.Jud.Disc. 2014) (sanction of removal).

12. *See e.g.* **In re Merlo**, 619 Pa. 1, 58 A.3d 1 (2012) (sanction of removal); **In re Lokuta**, 964 A.2d 988 (Pa.Ct.Jud.Disc. 2008) (sanction of removal), *affirmed*, 608 Pa. 223, 11 A.3d 427 (2011).

plary, and, according to Respondent's witnesses, Respondent is well-regarded as a jurist. Lastly, as recited above, Respondent resigned his commission as a Justice of the Pennsylvania Supreme Court on March 15, 2016.[13]

In our Discussion, *infra*, we concluded that Respondent's conduct not only failed to promote public confidence in the integrity and impartiality of the judiciary, but moreover seriously jeopardized the reputation of the judiciary. In this regard, Respondent failed to recognize that all members of the judiciary are holders of a public trust and stewards of the judicial power of our Commonwealth.[14] The common thread of the emails, with their imagery of sexism, racism, and bigotry, is arrogance and the belief that an individual is better than his or her peers. Such beliefs are antithetical to the privilege of holding public office, where the charge is to serve, not demean, our citizens. As a Justice of our Supreme Court, Respondent's position on our highest court involved not only setting administrative policy, but also pronouncing the law of our Commonwealth. This makes the violations cited herein all the more egregious.

13. We also note that had Respondent not resigned, his continued presence would have resulted in many motions seeking his recusal being filed in cases before the Commonwealth's highest court.

14. Our Supreme Court has stated that its "principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth." **In re Bruno**, 627 Pa. 505, 101 A.3d 635, 675 (2014). The Court can only act, of course, through its justices.

15. Section 18(b)(5) provides this Court may order "...removal from office, suspension, censure, *or other discipline* as authorized by this section and as warranted by the record." PA. CONST. art. V, § 18(b)(5). Our Constitution

In reaching an appropriate sanction, we substantially and significantly reduce what would likely have been the sanction given Respondent's acceptance of responsibility, and his resignation.

In consideration of the foregoing factors, the Court enters the following order:

## ORDER OF COURT

Pursuant to the authority contained in PA. CONST. art. V, § 18(b)(5), and in consideration of the misconduct recited above, a FINE [15] is hereby imposed upon Respondent, now-Former [16] Justice J. Michael Eakin, in the amount of Fifty Thousand Dollars ($50,000.00), to be paid to the Administrative Office of Pennsylvania Courts, to be remitted to the General Fund of this Commonwealth, within six (6) months of the date of this Order.

## ADDENDUM A

E–Mails Received by the Respondent Contained On the November 5, 2014 Disc

a. An e-mail bearing the subject line "FW: A little family fun...FW WHEN YOUR DAUGHTER

provides wide latitude in our fashioning a sanction to address the unique circumstances of judicial discipline concerns. These concerns include restoring public confidence in the impartiality of the judiciary. This Court also commonly imposes sanctions other than those listed in Section 18, such as reprimand and judicial probation. We also note that the imposition of fines in judicial discipline cases to address violations is not uncommon in many states. *See* Cynthia Gray, A Study of State Judicial Discipline Sanctions, American Judicature Society (now part of the National Center for State Courts), 2002.

16. In light of Respondent's retirement from active service we see this sanction as tantamount to a six month suspension without pay.

WANTS TO GET HER EARS PIERCED", sent Thursday, April 8, 2010, at 4:53 p.m., by Attorney McGowan.

This e-mail contains a video clip of a scene from a motion picture titled "Say It Isn't So" (R 2001), wherein a family eating dinner is discussing the propriety of their daughter's ear piercings. In rage, she exposes her breasts and her pierced nipples.

b. An e-mail bearing the subject line "FW: Bank," sent Monday, May 11, 2009, at 11:39 a.m., by Attorney McGowan.

This e-mail contains a clip of a comedy skit wherein a woman in line at a sperm bank is asked a question by a man, and, when she responds, she spits out what appears to be semen in her mouth.

c. An e-mail bearing the subject line "FW: Beware of the Big Bad Wolf xxxx", sent Wednesday, July 29, 2009, at 12:13 p.m. by Attorney McGowan.

 i. This e-mail contains a cartoon video clip of Little Red Riding Hood, the Three Little Pigs, and the Big Bad Wolf engaging in sexual conversations.

 ii. At the conclusion of the video, Little Red Riding Hood, nude, directs the Big Bad Wolf to "eat [her], just like the book says."

d. An e-mail bearing the subject line "FW: Friendship strings/a man's chain letter," sent Monday, February 9, 2009, at 9:10 a.m., sent by DAG Baxter.

This e-mail contains a pictorial "chain letter" interspersed with photographs of women in sexually suggestive poses wearing g-string panties. There is one photograph in the montage of women sunbathing with exposed breasts.

e. An e-mail bearing the subject line "FW : FW (no subject)", sent Tuesday, February 24, 2009, at 3:50 p.m., by Attorney McGowan.

 i. This e-mail contains topless photographs of an extraordinarily large breasted African American woman.

 ii. In the e-mail thread, the woman is described as being in the Guinness Book of World Records for her 100Z size bra.

f. A second e-mail bearing the subject line "FW: Fw (No subject)," sent Friday, March 6, 2009, at 5:06 p.m., by Attorney McGowan.

 i. This e-mail contains a picture of a Volkswagen Beetle with a woman's pubis on the car's hood.

 ii. The e-mail thread contends that the Beetle's female owner photographed her own pubis and somehow was able to put the picture on the car's hood.

g. An e-mail bearing the subject line "FW: Fwd Why women stay single..." sent on Wednesday, March 5, 2009, at 11:47 a.m., by Attorney McGowan.

This e-mail contains a montage of pictures of men in bizarre scantily-clad costumes.

h. An e-mail bearing the subject line "FW: Girls You Can't Take Anywhere," sent Saturday, December 4, 2010, at 1:31 p.m., by Attorney McGowan.

 i. This e-mail contains a pictorial montage of women, fully clothed, generally making sexually suggestive poses in public with inanimate objects.

 ii. In one photograph, a woman is shown sucking milk from a cow's udder.

i. An e-mail bearing the subject line "FW: Happy Ending!" sent Monday, May 10, 2010, at 4:07 p.m., by Attorney McGowan.

This e-mail contains a joke clip where, after a man receives a massage from a female Asian masseuse in a bikini, she asks if he wants a "happy ending," impliedly, a sexual favor. He responds "yes," and balloons and clowns fill the room as if it was a birthday party.

j. An e-mail bearing the subject line "FW: How to tell when your house is infected with the swine flu" sent Friday, May 15, 2008, at 12:35 p.m., by Attorney McGowan.

This e-mail contains a forwarded picture of an obese nude woman on all fours wearing a pig's snout, pig's ears, and a pig's tail.

k. Two e-mails bearing the subject line "FW: Ladies toilet," sent Monday, February 23, 2009, at 2:01 p.m. and 2:03 p.m., respectively, by Attorney McGowan

These e-mails contain a video clip of a prank where a man, wearing a toilet costume scares two women attempting to use a public bathroom.

l. An e-mail bearing the subject line "FW: Mission Impossible" sent Tuesday, October 6, 2009, at 3:01 p.m., by Attorney McGowan.

This e-mail contains a video clip of an average-sized man engaging in sexual intercourse with a large woman, while the theme from "Mission Impossible" played in the background.

m. An e-mail bearing the subject line "FW: Morning Funnies" sent Wednesday, July 29, 2009, at 11:33 a.m., by Attorney McGowan.

This e-mail contains a photographic slide show entitled "All men are the same." Generally, the pictures show small children ogling women's breasts and bodies. One photograph depicts a picture of a woman on a nude beach with a baby sitting next to her grabbing one of her nipples, and one photograph has a small child putting the breasts of an unclothed Barbie doll in his mouth.

n. An e-mail bearing the subject line "FW: Please Help!!" sent Wednesday, January 14, 2009, at 3:55 p.m., by Attorney McGowan.

This e-mail contains a clip of a Comedy Central skit featuring Carmen Electra talking about a faux "charity" called "Tits for Tots."

o. An e-mail bearing the subject line "FW: Short golf story..." sent Tuesday, July 10, 2012, at 3:26 p.m., by Attorney McGowan.

This e-mail contains a joke about a golfer cheating on his wife and, impliedly, running her over with his golf cart.

p. An e-mail bearing the subject line "FW: the end of civilization" sent Friday, January 30, 2009, at 3:36 p.m., by Attorney McGowan.

This e-mail contains a video clip of Eve walking around the Garden of Eden wherein she is greeted by an effeminate Adam.

q. An e-mail bearing the subject line "FW: THIS IS THE BEST HALLOWEEN COSTUME EVER" sent Wednesday, October 28, 2009, at 2:26 p.m., by Attorney McGowan.

This e-mail contains the same video clip described above at Paragraph 28(k)(i).

r. An e-mail bearing the subject line "FW: Too Old to Squat" sent Tuesday, June 7, 2011, at 11:09 a.m., by Attorney McGowan.

This e-mail contains a joke and a corresponding montage of photographs of men and women in various levels of undress.

s. An e-mail bearing the subject line "FW: UPS Man" sent Wednesday, October 20, 2010, at 1:15 p.m., by Attorney McGowan.

This e-mail contains a video clip of a UPS man delivering a package to a woman's home. The woman, who jumped out of the shower still nude, is visible from behind. When she approaches the door, the UPS man opens the mail slot, looks in, and says "Hey curly, is your mom home?" The woman runs away.

t. An e-mail bearing the subject line "FW: VIBRATOR WARNING..." sent Monday, June 21, 2010, at 5:32 p.m., by Attorney McGowan.

This e-mail contains a two-part pictorial joke; the first picture attempts to warn women against using a corn cob for a vibrator. The second picture is of a topless woman with her legs spread, with her genital area entirely covered by popcorn.

u. An e-mail bearing the subject line "FW: When Somebody Steals Your Kodak Moment" sent Tuesday, January 13, 2009, at 5:35 p.m., by Attorney McGowan.

This e-mail contains a collage of pictures of people being "photobombed" in various ways. For example, in one picture, a couple is being married on a beach and, in the distance of the photograph, a topless woman is walking down the beach.

v. An e-mail bearing the subject line "Fwd: A REAL MAN'S CHAIN LETTER –XXX" sent Thursday, November 12, 2009, at 7:51 p.m., by B.M., a member of the golfing group.

This e-mail contains a series of pictures of women in a wet t-shirt contest and two photos of a woman's breasts.

w. An e-mail bearing the subject line "FW: ANOTHER SELFISH SPORTS STAR sent Wednesday, August 18, 2010, at 9:53 p.m., by B.M.

i. This e-mail contains a picture of pro tennis player Simona Halep playing tennis, and a discussion about her 34 DD breasts and the difficulty that they cause her when playing tennis.

ii. The e-mail then states "WILL SOMEONE PLEASE TELL THIS KID THAT WINNING ISN'T EVERYTHING! THIS SELFISH SPOILED LITTLE BRAT SHOULDN'T BE SO CONSUMED WITH 'WINNING MAJOR TENNIS TOURNAMENTS'! WHAT ABOUT US...THE HARDWORKING EVERYDAY FAN?"

x. An e-mail bearing the subject line "Fwd: Beer Temperature Tester," sent Tuesday, February 14, 2012, at 1:25 p.m., by B.M.

This e-mail contains two pictures of a woman dipping her nipples into glasses of beer.

y. An e-mail bearing the subject line "Fwd: cup sizes tt#2," sent Monday, January 2, 2012, at 3:37 p.m., by B.M.

i. This e-mail contains a joke interspersed with pictures of nude or semi-nude women of increasing breast size. The joke concludes with an over-sized golf tin cup.

ii. The joke asks, "WHICH OF THE FOUR CUP SIZES PICTURED BELOW EXCITES OLDER MEN THE MOST?"

z. An e-mail bearing the subject line "Fwd: Farewell to My Golf Friends," sent Sunday, December 19, 2010, at 5:36 p.m., by B.M.

i. This e-mail contains a photographic slide show of pictures concluding with two pictures of nude or semi-nude women on bicycles.

ii. The joke indicates that the golfer has taken up a new hobby with new "Friends."

aa. An e-mail bearing the subject line "Fwd: Fw: Daily meds" sent on Friday, February 26, 2010, at 3:39 p.m., by B.M.

This e-mail contains pictures of nude or semi-nude women in sexually suggestive poses.

bb. An e-mail bearing the subject line "Fwd: FW: Emailing: Male Anti-depressants.wmv," sent Saturday, November 27, 2010, at 11:48 p.m., by B.M.

i. This e-mail contains a video featuring shorter video clips of women's breasts' bouncing; some of the women in the clips expose their bare breasts.

ii. While the clip plays, the song "Don't Worry, Be Happy" plays in the background.

cc. An e-mail bearing the subject line "Fwd: Fw: Hooter's 2th XX," sent Wednesday, May 12, 2010, at 8:06 p.m., by B.M.

i. This e-mail contains a photographic slide show of nude women, who were apparently employed by Hooter's restaurant.

ii. The images appear to be scanned from *Playboy* magazine.

dd. An e-mail bearing the subject line "Fwd: FW: Priceless," sent Tuesday, June 8, 2010, at 8:06 p.m., by B.M.

i. This e-mail contains a photograph and corresponding joke. The joke states "Admission to Six Flags.... $65.000; Popcorn and a soda at the refreshment stand...... $9.00; Paint-on tattoo.... $7.00; a set of tits that can handle 5 G's on a roller coaster and still look firm. Priceless!"

ii. The picture is of two women exposing their breasts while riding a roller coaster.

ee. An e-mail bearing the subject line "Fwd: Fw: We stare because we care (it all makes sense to me!)," sent Wednesday, September 23, 2009, at 9:43 a.m., by B.M.

This e-mail contains a number of photographs of nude women in sexually suggestive poses.

ff. An e-mail bearing the subject line "Fwd: FW: Will the dollar fall?" sent Thursday, February 25, 2010, at 9:21 p.m., by B.M.

This e-mail is a picture of a nude woman with a 100 dollar bill between her buttocks.

gg. An e-mail bearing the subject line "Fwd: Greek Economy," sent Saturday, November 27, 2010, at 11:28 a.m., by B.M.

i. This e-mail contains a joke and a picture of a woman sitting in a restaurant next to an ashtray; due to the angle of the camera shot, one of her bare breasts is visible in the picture.

ii. The joke says "There is no way in hell the Greeks will be able to control their economy and meet the terms of the bailout by the EEC and the IMF. They can't even enforce their No Smoking regulations.

The new law banned smoking in their eateries since 7/1/09. Look how many cigarettes are in the ash-tray...In this restaurant...".

hh. An e-mail bearing the subject line "Fwd: How do YOU pronounce Oklahoma?" sent Thursday, April 22, 2010, at 1:23 p.m., by B.M.

This e-mail contains a picture of a large-breasted young woman wearing a tight fitting Oklahoma t-shirt.

ii. An e-mail bearing the subject line "Fwd: MOTIVATIONAL POSTERS," sent Wednesday, February 15, 2012, at 1:21 p.m., by B.M.

i. This e-mail contains a photographic picture slide show containing "motivational" or "demotivational" pictures with pictures of semi-nude or topless women in them.

ii. The majority contain sexually-suggestive themes or jokes based on gender or sexual orientation.

iii. One picture of an apparently nude woman sitting on a bed has the following text:, "Dear Abby, I'm an 18 year-old virgin in Arkansas. Are my brothers gay?"

iv. Another picture depicts what appears to be a feminist protest in front of a Hooters restaurant; the text of the picture states "SEX-ISM—Only ugly bitches complain about it."

jj. An e-mail bearing the subject line "Fwd: Neck exercises sent to me by a doctor—great 4 poker players too," sent Sunday, January 29, 2012, at 1:34 p.m., by B.M.

This e-mail contains photographs of nude or semi-nude women at odd angles that require the viewer to stretch their neck to see the picture in its intended fashion.

kk. An e-mail bearing the subject line "Fwd: Personal Note," sent Sunday, December 18, 2011, at 8:02 p.m., by B.M.

i. This e-mail contains a joke which included a series of pictures of women in increasing levels of undress, culminating in a picture of a topless woman in a hot tub.

ii. the Respondent responded to this e-mail, as set forth above at Paragraph 27(b).

ll. An e-mail bearing the subject line "Fwd: protect your nose from the sun," sent Monday, August 2, 2010, at 8:55 p.m., by B.M.

This e-mail contains a picture of a man and a woman in the ocean; the man is kissing the woman's stomach and his nose is in a shadow caused by her breasts.

mm. Three e-mails bearing the subject line "Re: FW How to tell when your house is infected with the swine flu" sent Friday, May 15, 2009 at 1:04 p.m. by B.P., 1:42 p.m., by J.E., and 1:50 p.m. by E.S., respectively.

i. These e-mails were sent to the Respondent and the other recipients of Attorney McGowan's "swine flu" e-mail by the aforementioned persons.

ii. the Respondent did not respond to the e-mails.

nn. An e-mail bearing the subject line "Re: Neck exercises sent to me by a doctor," sent Sunday, Sunday, January 29, 2012, by C.S., another member of the Respondent's golfing group.

i. This e-mail was sent to the Respondent and the other recipients of the "Neck exercises" e-mail noted above at Paragraph 28(jj).

ii. the Respondent did not author a response to the e-mail.

oo. Other than what is described above at Paragraph 27(b), there were no e-mails contained on the November 5, 2014 disc that suggested that the Respondent replied or responded to any of the e-mails sent to him by others that contained nude or semi-nude women, video clips of comedic skits that had sexually-suggestive themes, and photographic slide shows of faux "motivational posters" and other pictures that contained nude or semi-nude women and jokes based on negative social and gender stereotypes that were contained on the November 5, 2014 disc.

## ADDENDUM B

E–Mails Received by the Respondent Contained on the "Electronic Vault"

i. An e-mail sent on December 11, 2008, bearing the subject line "FW: Fwd(3) Did I read it right? ? ?" This e-mail contains signs or billboards with typographical errors, bizarre or offensive messages.

 a. One sign advertises Southern Comfort liquor and states "Liquid panty remover."

 b. Another sign states "Pasadena High—School Tarts Mon.—9 A.M."

ii. An e-mail sent on January 27, 2009, bearing the subject line "FW: FW: Foreign Commercials" sent on January 27, 2009. This e-mail contains video clips of several foreign commercials. One of these commercials depicts a man sitting in a bar, who is approached by a seductively-dressed woman. When she attempts to sit down next to the man, he pulls the chair away from her to retrieve the bag of snacks that was on the chair. She then falls to the ground.

iii. An e-mail sent on April 20, 2009, bearing the subject line "FW: Fw: Best Husband (UNCLASSIFIED)." This e-mail contains a picture slide show of men, supposedly husbands, watching women, supposedly their wives, do strenuous physical activity without assisting.

iv. An e-mail sent on April 28, 2009, bearing the subject line "FW: Fw: Can you be fooled? ? ?" This e-mail contains pictures of Thai transsexual women and asks the viewer to guess whether the pictured transsexual women is "a girl or a guy." In fact, all of the transsexual women pictured were born male.

v. An e-mail sent on September 21, 2009, bearing the subject line "FW: The People at Wal–Mart." This e-mail contains pictures of people at Wal–Mart with outlandish dress or appearance.

vi. An e-mail sent on December 3, 2009, bearing the subject line "FW: Tiger." This e-mail contains a picture of Tiger Woods and his former wife, who is holding a golf club. Tiger Wood's face is Photoshopped to indicate that his wife beat him with the golf club.

vii. An e-mail sent on December 15, 2009, bearing the subject line "FW: Recruiting…Navy style." This e-mail contains a video clip suggesting that potential recruits should consider the United States Navy because it is "co-ed" and that, consequently, they could "get laid." The clip contains photographs of women in American flag bikinis and an image of a man and a woman in a shower together, but there are no pictures of bare female breasts, but-

tocks, male or female genitals, or pornographic content.

viii. An e-mail sent on December 24, 2009, bearing the subject line "Fw: I DIDN'T KNOW YOU COULD DANCE." This e-mail contains a clip of a man doing a strip tease for a woman; when he strips down to his underwear, a brown stain is visible on the underwear, and the woman laughs.

ix. An e-mail sent on January 28, 2010, bearing the subject line "FW: Fwd: The Border." This e-mail contains the following statement:

*LET ME SEE IF I GOT THIS RIGHT..*

IF YOU CROSS THE NORTH KOREAN BORDER ILLEGALLY YOU GET 12 YEARS HARD LABOR.

IF YOU CROSS THE IRANIAN BORDER ILLEGALLY YOU ARE DETAINED INDEFINITELY.

IF YOU CROSS THE AFGHAN BORDER ILLEGALLY, YOU GET SHOT.

IF YOU CROSS THE SAUDI ARABIAN BORDER ILLEGALLY YOU WILL BE JAILED.

IF YOU CROSS THE CHINESE BORDER ILLEGALLY YOU MAY NEVER BE HEARD FROM AGAIN.

IF YOU CROSS THE VENEZUELAN BORDER ILLEGALLY YOU WILL BE BRANDED A SPY AND YOUR FATE WILL BE SEALED.

IF YOU CROSS THE CUBAN BORDER ILLEGALLY YOU WILL BE THROWN INTO POLITICAL PRISON TO ROT.

IF YOU CROSS THE U.S. BORDER ILLEGALLY, YOU GET

*A JOB,

*A DRIVERS LICENSE,

*SOCIAL SECURITY CARD,

*WELFARE

*FOOD STAMPS,

*CREDIT CARDS,

*SUBSIDIZED RENT OR A LOAN TO BUY A HOUSE,

*FREE EDUCATION,

*FREE HEALTH CARE,

*A LOBBYIST IN WASHINGTON

*BILLIONS OF DOLLARS WORTH OF PUBLIC DOCUMENTS PRINTED IN YOUR LANGUAGE

*THE RIGHT TO CARRY YOUR COUNTRY'S FLAG WHILE YOU PROTEST THAT YOU DON'T GET ENOUGH RESPECT

*AND YOU CAN VOTE REPUBLICAN or DEMOCRATIC.

I JUST WANTED TO MAKE SURE I HAD A FIRM GRASP ON THE SITUATION...

x. An e-mail sent on March 18, 2010 bearing the subject line FW: Canadian signs They tell it like it is." This e-mail contains pictures of billboards and signs allegedly posted in Canada.

a. One sign allegedly from the American Kennel Club states "It's all about the bitches."

b. Another sign allegedly advertised the then-new 2003 BMW Z3 Roadster stating "For when you can't get laid on your looks and charm alone."

ADDENDUM C

E–Mails Sent By the Respondent From His "John Smith" Account

a. An e-mail bearing the subject line "Advice from a retired sympathetic husband," sent Friday, February 2, 2012, at 8:54 am.

This e-mail is a "joke" type e-mail about a retired husband named "Ron" who recounts treating his wife in a sexist fashion while making it seem like he was doing her a favor. The punchline of the joke concludes with an "editor's note" about "Ron" being found with a "golf club jammed up his rear end."

b. An e-mail bearing the subject line "Environmental Spill," sent Monday, May 10, 2010, at 10:28 a.m.

This e-mail contains text that states the following: "Subject: Slut Bus Crashes Causing Major Slut Spill...As if they didn't have enough problems.....There is nothing worse than California slut!" Attached to the e-mail is a file entitled "Slut_Bus_Crashes_Causing_Major_Slut_Spill. wmv" which is a satirical video production by the Union.com about a busload of "sluts" crashing in California. The video contains images of suggestively dressed, and one bare-breasted, women who are drinking alcohol to excess and engaging in compromising, sexually-suggestive activity.

c. An e-mail bearing the subject line "Re: Environmental Spill," sent Monday, May 10, 2010, at 10:46 a.m.

i. This e-mail contains text that constituted the Respondent's response to a comment made by DAG Baxter regarding the "Slut Bus" video mentioned above at Paragraph 67(b).

ii. the Respondent's response was as follows: "As [G.S.] once remarked.. 'Ah, the smell of tittie powder in the morning."

d. An e-mail bearing the subject line "For your edification," sent Wednesday, June 1, 2011 at 10:20 a.m.

This e-mail contains text that states the following: "How the word Boob was invented[,]" which is followed by a pictorial joke using the letters of the word "boob" to imply views of a woman's breasts from different directions, i.e., "B– top view," and the like.

e. An e-mail bearing the subject line "Fw (no subject)," sent Monday, January 30, 2012, at 10:41 a.m.

This e-mail contains text that states the following: "This is how a bacon cheeseburger is made. It was sent to me by my doctor so I know it is true. Don't bother checking Snopes." Following the text is a picture of a pig attempting to mount a cow lying in a field.

f. An e-mail bearing the subject line "Fw: Arnold's misunderstanding" sent Tuesday, June 7, 2011, at 10:58 a.m.

This e-mail contains the following text: "It's too bad Arnold Schwarzenegger had this little misunderstanding because English isn't his native language. He told Maria that their housekeeper wanted a raise. Maria said, 'Screw her.' Any simple-minded, semi-literate Austrian could have made the same mistake."

g. An e-mail bearing the subject line "Fw: MAY ALL YOUR DAYS START THIS WELL," sent Tuesday, July 6, 2010, at 1:24 p.m.

This e-mail contains the following text: "My suggestion for about the only way Julie the Cruise Director could improve the Myrtle trip....." Following the text is a picture of an older man riding his bike towards the camera, smiling, and a shirtless woman walking away from the camera. At the bottom of the picture is the caption "Some Days—they just start better than others."

 

h. An e-mail bearing the subject line "Marital advice," sent Tuesday, July 6, 2010, at 1:20 p.m.

This e-mail contains text that states the following: "A woman goes to the doctor, beaten black and Blue.

Doctor: 'What happened?'

Woman: 'Doctor, I don't know what to do.

Every time my husband comes home drunk he beats me to a pulp.'

Doctor: 'I have a real good medicine for that. When your husband comes home drunk, just take a glass of sweet tea and start swishing it in your mouth. Just swish and swish but don't swallow until he goes to bed and is asleep.'

Two weeks later the woman comes back to the doctor looking fresh and reborn.

Woman: 'Doctor that was a brilliant idea! Every time by husband came home drunk, I swished that sweet tea. I swished and swished, and he didn't touch me!'

Doctor: 'You see how much keeping your mouth shut helps?'

i. An e-mail bearing the subject line "Re: Holiday Party," sent Thursday, December 17, 2009, at 9:15 a.m.

 i. This e-mail constitutes a response by the Respondent to DAG Baxter's initiating e-mail regarding his inability to attend the Respondent's annual Holiday Party. At the close of DAG Baxter's message, he asks the Respondent to "Slap Stoney's ass for me and wish him a Merry Christmas. Lubba's too if he shows up. And, well, Janey's too and let me know how it was. Maybe next year we won't have the conflict and I can slap hers for myself."

 ii. the Respondent responded, in part, "Will do."

j. Two e-mails bearing the subject line "Re: [L.] getting married," sent Monday, 12/28/2009, at 1:49 p.m. and 2:44 p.m., respectively.

These e-mails constitute a sexually-suggestive thread/conversation between the Respondent and DAG Baxter about a woman who they both know that was employed by the Respondent at the time of the e-mail thread/conversation.

k. Six e-mails bearing the subject line "Re: Myrtle next year![,]" sent Thursday, June 18, 2009, between 8:45 a.m. and 10:21 a.m.

 i. These e-mails constitute a thread/discussion between the Respondent and his golfing group.

 ii. Points in the thread/discussion became sexually suggestive; at one point in the exchange, the Respondent wrote the following: "Being on the road—I just got this exchange—you guys sound like a bunch of women, worrying about offending and being misunderstood and falling all over each other thanking everyone and getting misty eyed! Jeezus, boys, is it a menstrual [sic] thing? The next thing we'll be splitting the check at Finn McCool[']s 'now you had the BLT and an iced tea, so you owe. . . .' Snap the hell out of it!!! Everybody's great, everybody's in—Bax, get the money up front and all of the rest of us will go. New Judge [B.] will find [out] a judge has to go out of state to see boobs. New Dad [S.] will go unless he knocks Momma up again. [S.] can spend an extra hour in the OR and pay for all of us!! I'm in. I've

got a stake of fifty ones and a titty-deficit that needs cured."

iii. A sexually-suggestive thread/discussion continued between the Respondent and DAG Baxter regarding two women known to both men.

l. Three e-mails bearing the subject line "Re: Personal Note," sent Monday, December 19, 2011, at 1:24 Thursday, December 22, 2011, at 9:07 a.m., p.m., and Tuesday, December 27, 2011, at 11:48 a.m.

i. These e-mails constitute a thread/discussion between the Respondent and his golfing group that was initiated with an attempted joke containing several embedded pictures of partially nude or scantily-clad women.

ii. This e-mail thread was referred to above at Paragraphs 27(b) and 28(kk), and was contained in part on the November 5, 2014 disc.

m. An e-mail bearing the subject line "The complete list (so far)," sent Friday, December 4, 2009, at 9:48 a.m.

i. This e-mail constituted a list of off-color jokes regarding Tiger Woods' failed marriage.

ii. One of the jokes was "Given Tiger's racial heritage, can we call this a Black Thai affair?"

n. An e-mail bearing no subject line, sent Monday, April 20, 2009, at 3:04 p.m.

i. This e-mail constituted an off color joke regarding President Barack Obama.

ii. The joke states "In honor of the 44th President of the United States, Baskin–Robbins Ice Cream has introduced a new flavor, "Barocky Road[.] Barocky Road is a blend of half Vanilla, half Chocolate, and surrounded by Nuts and Flakes. The Vanilla portion of the mix is not openly advertised and usually denied as an ingredient. The Nuts and Flakes are all very bitter and hard to swallow. The cost is $100.00 per scoop. When purchased it will be presented to you in a large, beautiful cone, but then the Ice Cream is taken away and given to the person in line behind you. Thus[,] you are left with an empty wallet, no change, holding an empty cone, with no hope of getting any Ice Cream."

o. An e-mail bearing the subject line "Re: I need your advice," sent Monday, December 23, 2013, at 9:50 a.m.

i. This e-mail is part of a thread/discussion initiated by an e-mail from one of the Respondent's golfing group containing pictures of a large-breasted woman in tight fitting clothing doing yoga exercises in a field; the joke asks, "I need your advice—Should the grass be cut?"

ii. the Respondent responded to the joke.

p. An e-mail bearing the subject line, "Warning do NOT take your girl to the Phillies game this weekend," sent Monday, May 21, 2012, at 9:56 a.m. This e-mail contains a link to a YouTube.com video, which is apparently a satirical video of a montage of men claiming that former Phillies' baseball player Pat Burrell had sexual intercourse with their girlfriends. The video contains "bleeped out" profanity, but no nudity.

q. An e-mail bearing the subject line, "Query: did Fioravanti get a partnership cut," sent Monday, July 26, 2013, at 12:48 p.m.

 

This e-mail reprints an article that reported that an attorney named Knight (first name not stated) of the Bucks County law firm Fioravanti & Knight was suspended by the Pennsylvania Supreme Court for one year because he received oral sex from a woman in exchange for legal services in a DUI case.

r. An e-mail bearing the subject line "Why I failed 4th Grade," sent Monday, March 29, 2010.

The e-mail is the same e-mail mentioned at Paragraph 27(a) above.

## ADDENDUM D

E–Mails Received By the Respondent At His "John Smith" E–Mail Account

a. A number of the e-mails received by the Respondent from the golfing group contained pictures of nude women; sexually-suggestive themes; gender stereotypes; homophobic content; socioeconomic stereotypes; violence towards women; racial humor; ethnically-based humor; and stereotypes of religious groups. These e-mails contain material including, but not limited to, the following:

i. A video clip, entitled "What have we done," of a black woman speaking to the camera about Barack Obama and saying that, as a result of his election, black people won't have to "pay bills." She later bemoans the fact that black people will "have to get jobs" and will, consequently, no longer get a government assistance check. This clip was forwarded by DAG Baxter, and it was not included in the November 5, 2014 disc. This e-mail was sent on Monday, September 21, 2009.

ii. A picture of a large-breasted professional tennis player named Si-

mona Halep, who is described as wanting breast reduction surgery to help her tennis game. The subject line of the e-mail is "FW: a Sad Day for Tennis." There is no nudity. This e-mail was noted above at Paragraph 28(w). This e-mail was forwarded by Attorney McGowan, and it was also forwarded to the Respondent by B.M. The e-mail from Attorney McGowan was not included on the November 5, 2014 disc, although the picture was included in a different e-mail from B.M. This e-mail was sent on Tuesday, June 15, 2010.

iii. A video clip consisting of an audio track of a prank phone call played on the "Bob and Tom Show," wherein a telemarketer is told by the pranker that the person who was called by the telemarketer was killed and the police were investigating the murder scene. This clip contains some profanity. The e-mail was forwarded by C.S. of the golfing group and it was not included in the November 5, 2014 disc. This e-mail was sent on Monday, March 14, 2011.

iv. A series of pictures and text with the subject line "FW: Black is In!" showing pictures of notable black celebrities, including President Obama, highlighting their accomplishments, and concluding with a picture of Michael Jackson, which stated ". . . Michael Jackson must be kicking himself." This e-mail was sent by DAG Baxter to the Respondent and others. It was not included in the November 5, 2014 disc. This e-mail was sent on Wednesday, April 22, 2009.

v. A video clip of a woman throwing out a "cheap pair of Kmart ear-

rings" on Christmas morning to find that her husband has actually purchased a new Cadillac SUV for her. When she gets in the Cadillac and starts it, it explodes. The video concludes with the words "Merry Christmas, Bitch." This e-mail was forwarded by DAG Baxter, and it was not included in the November 5, 2014 disc. This e-mail was sent Wednesday, December 21, 2011.

vi. A joke wherein the punchline is a man's name representing the things he enjoys the most, i.e., "B.J. Titsengolf." This joke was forwarded by C.S. to the Respondent, and it was not included in the November 5, 2014 disc. This e-mail was sent on Tuesday, June 16, 2009.

vii. A video clip containing an audio track of a man prank calling a cable company about a new gay and lesbian channel. The audio contains profanity and jokes portraying a negative view of gays and lesbians based on stereotypes. This e-mail was forwarded to the Respondent by DAG Baxter. It was not included in the November 5, 2014 disc. This e-mail was sent on Monday, September 14, 2009.

viii. A video clip in German about Nintendo Wii games which women "should" play, including games that simulate cooking and performing oral sex on men. This e-mail was forwarded by DAG Baxter to the Respondent, and it was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, April 29, 2009.

ix. A series of nude or semi-nude photographs of women entitled "Friendship strings," which is a reference to the g-string panties worn by some of the women in the pictures. This e-mail was mentioned above at Paragraph 28(d). This e-mail was forwarded to the Respondent by DAG Baxter. This e-mail, or some part of the thread that it generated, was included on the November 5, 2014 disc. This e-mail was sent on Monday, February 9, 2009.

x. A forwarded joke saying "It was once said that a black man would be president when 'pigs fly.' Indeed, 100 days into Obama's presidency…'swine flu'!!!" This e-mail was forwarded to the Respondent by DAG Baxter. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, April 30, 2009.

xi. A joke entitled "golf panties" about couples of Swedish, Irish, and Scottish origin golfing when the wind reveals that the women of the group are not wearing underwear. Upon seeing that his wife is not wearing underwear, the Scotsman offers his wife a comb and tells her to "tidy" up. This e-mail was sent by DAG Baxter to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent Thursday, August 20, 2009.

xii. A joke entitled "Man Rules." This lists a number of "rules" for women to follow when dealing with men. These rules are evidently based on gender stereotypes such as "Christopher Columbus didn't need directions and neither do we!" This e-mail was sent by C.S. to the Respondent. It was not included on the November 5, 2014

disc. This e-mail was sent on January 26, 2012.

xiii. A joke video clip with a puppet Osama Bin Laden threatening to kill Santa Claus. This e-mail was sent by DAG Baxter to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, December 7, 2009.

xiv. A comedy routine by a woman named "Mrs. Hughes," who jokes about her husband and her family life. This e-mail was sent by DAG Baxter to the Respondent. It was not included in the November 5, 2014 disc. This e-mail was sent on Wednesday, October 27, 2010.

xv. A series of "demotivational" posters entitled "New Motivational posters." The jokes are geared toward animals, parenting, female breasts, and Asian accents. This e-mail was sent by DAG Baxter to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, May 7, 2009.

xvi. An e-mail entitled a "prayer for dad" with a picture of a young girl praying, with the text "Dear God, please send clothes for all the ladies on Daddy's computer. Amen." This e-mail was sent by C.S. to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, December 1, 2009.

xvii. A series of jokes entitled "rotten but funny," which include jokes about race, gender, and ethnicity. This series of jokes was sent by DAG Baxter to the Respondent. It was not included on the No-

vember 5, 2014 disc. This e-mail was sent on Monday, December 27, 2010.

xviii. A joke about an environmentalist woman having to slide down a tree in haste. When she goes to the doctor and asked what took him so long to tend to her wounds, the doctor says "Well, I had to get permits from the Environmental Protection agency, the Forest Service, Fish and Wildlife Commission and the Bureau of Land Management before I could remove old-growth timber from a recreational area. I'm sorry, but due to Obamacare, they turned me down." The joke was sent by DAG Baxter to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, January 11, 2011.

xix. A picture of a woman using her nipples as "beer temperature" testers. This e-mail was sent by B.M. to the Respondent. This e-mail was noted above at Paragraph 28(x). It was included on the November 5, 2014 disc. This e-mail was sent on Tuesday, February 14, 2012.

xx. A series of pictures entitled a "Real man's Chain Letter" featuring pictures of women in a wet t-shirt contest and a topless woman. This e-mail was sent to the Respondent by B.M., his golfing friend. This e-mail was noted above at Paragraph 28(v). It was included on the November 5, 2014 disc. This e-mail was sent on Thursday, November 12, 2009.

xxi. A joke e-mail regarding a woman's vagina which states, that "the best engine in the world is

the vagina. It can be started with one finger. It is self-lubricating. It takes any size piston. And it changes its own oil every four weeks. It is only a pity that the management system is so fucking temperamental." This e-mail was sent by B.M. to the Respondent. There are no nude pictures. This e-mail was not included on the November 5, 2014 disc. This e-mail was sent on Sunday, July 25, 2010.

xxii. A picture of bare breasted women of increasing breast size entitled "Cup sizes." The last picture is of an oversized golf tee, and the e-mail asks "Which cup size excites older men the most?" This e-mail was noted above at Paragraph 28(y) sent by B.M. to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Monday, January 2, 2012.

xxiii. A slide show called "Farewell to my Golf Friends," which includes pictures of bare breasted women and pictures of their buttocks. This e-mail was noted above at Paragraph 28(z). This e-mail was sent by B.M. to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Sunday, December 19, 2010.

xxiv. A slide show called "Daily meds" which contains pictures of nude or semi-nude women evidently scanned from Playboy magazine. This e-mail was sent by B.M. to the Respondent. This e-mail was noted above at Paragraph 28(aa). It was included on the November 5, 2014 disc. This e-mail was sent on Friday, February 26, 2010.

xxv. A video clip of both clothed and bare female breasts bouncing while the song "Don't Worry, Be Happy" plays. This e-mail was noted above at Paragraph 28(bb). This e-mail was sent by B.M. to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Saturday, November 27, 2010.

xxvi. A picture of a large breasted woman holding a can of beer between her bare breasts, with the warning, "Don't do this to a can of beer, it will get warm and explode," This e-mail was sent to the Respondent by B.M. It was not included on the November 5, 2014 disc. This e-mail was sent on Sunday, April 25, 2010.

xxvii. A picture entitled "Priceless" of two women riding a roller coaster with their breasts exposed. This e-mail was noted above at Paragraph 28(dd). It was sent to the Respondent by B.M. It was included on the November 5, 2014 disc. This e-mail was sent on Tuesday, June 8, 2010.

xxviii. A video clip of a man farting in his car after he leaves his girlfriend's apartment; she runs to the car to give him one final kiss, and she discovers that he farted in the car. This e-mail was sent to the Respondent by DAG Baxter. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, February 27, 2012.

xxix. A series of pictures of bare breasted women entitled "We stare because we care." This e-mail was sent by B.M. to the

 

Respondent. This e-mail was noted above at Paragraph 28(ee). It was included on the November 5, 2014 disc. This e-mail was sent on Wednesday, September 23, 2009.

xxx. A picture entitled "Will the Dollar Fall," of a dollar bill squeezed between a woman's buttocks. This e-mail was noted above at Paragraph 28(ff). It was sent by B.M. to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Thursday, February 25, 2010.

xxxi. A joke about a little girl receiving a ticket from a mounted policeman for a safety violation while riding her new bike that Santa brought her. The girl asks, "Did Santa bring you that horse?" The policeman said "Yes." The little girl responds, "Tell Santa for next year that the dick goes beneath the horse, not on top of it." There is also a picture of a little girl giving the finger to whoever took her picture. This e-mail was sent by B.M. to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, May 10, 2010.

xxxii. A picture of a woman with an exposed breast sitting at a dinner table entitled "Fwd: Greek economy." The joke with the picture asks how many cigarettes were in an ashtray next to her. This e-mail was noted above at Paragraph 28(gg). It was sent to the Respondent by B.M. It was included on the November 5, 2014 disc. This e-mail

was sent on Saturday, November 27, 2010.

xxxiii. A series of "Motivational Posters" or "demotivational posters." This e-mail was noted above at Paragraph 28(ii). One picture asks, "Dear Abby, I'm an 18 year-old virgin in Arkansas. Are my brothers gay?" This e-mail was sent to the Respondent by B.M.. It was included on the November 5, 2014 disc. This e-mail was sent on Wednesday, February 15, 2012.

xxxiv. A series of nude pictures entitled "Neck exercises sent to me by a doctor." This e-mail was noted above at Paragraphs 28(jj) and 28(nn). The position of the photographs requires the viewer to bend their neck to see them properly. This e-mail was sent to the Respondent by B.M.. It was included on the November 5, 2014 disc. This e-mail was sent on Sunday, January 29, 2012.

xxxv. A series of pictures of bare breasts called "Protect your nose from the sun." The pictures are of a man kissing the stomach of a woman in a bikini, while the two swam in the ocean. This e-mail was noted above at Paragraph 28(ll). It was sent to the Respondent by B.M.. It was included on the November 5, 2014 disc. This e-mail was sent on Monday, August 2, 2010.

xxxvi. A joke called the "Water Miracle." This joke is the same as the "sweet tea" joke, but in this instance, the woman is told by the doctor to swish water in her

mouth. This e-mail was sent to the Respondent by B.M.. It was not included on the November 5, 2014 disc. This e-mail was sent on Friday, December 9, 2011.

xxxvii. A joke about robot golf caddies. According to the joke, the silver color of the robot caddies blinded the other golfers, and the golfer using the robot asks, "Why didn't you paint them black?" The man in the golf shop said, "We did. Then four of 'em didn't show for work, two filed for welfare, one of them robbed the pro shop, and the other thinks he's the President." This e-mail was sent by DAG Baxter to the Respondent. It was not included in the November 5, 2014 disc. This e-mail was sent on Thursday, August 18, 2011.

xxxviii. A joke about "hand jobs." This e-mail was sent by DAG Baxter to the Respondent. This e-mail was not included in the November 5, 2014 disc. This e-mail was sent on Wednesday January 6, 2010.

xxxix. A repeat e-mailing of the "May all Your Days Start this Well" e-mail described above at Paragraph 67(g). This e-mail was sent to the Respondent by B.M.. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday July 6, 2010.

xl. A photograph/joke combination about a "homeless golfer." The joke says, "I'm reaching out on behalf of a friend of mine who needs some help who wishes to remain anonymous. His wife told him to go out and get some of those pills that would help him get an erection. When he came back, he handed her diet pills. ANYWAY, he's looking for a place to live. Can you help him?" This e-mail was sent to the Respondent by DAG Baxter, it was not included in the November 5, 2014 disc. This e-mail was sent on Monday, January 23, 2012.

xli. A link to a YouTube video clip of the "Key and Peele" show on Comedy Central, wherein a black inner-city teacher substitutes in a predominantly white middle-class school district and mispronounces all of the students' names. For example, the teacher pronounces "Aaron" as "A–A–ron." This e-mail was sent by DAG Baxter to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, November 14, 2012.

xlii. An e-mail thread containing a message from DAG Baxter to, presumably, the Respondent and his golfing friends, which contains the statement, "While most of us are shoveling a foot of snow from our driveways, I thought now would be a good time to bring thoughts of warmth, golf, and titties your way!" This message was forwarded to the Respondent by DAG Baxter. It was not included on the November 5, 2014 disc. This e-mail was sent on Friday, January 3, 2014.

xliii. A series of pictures of a large breasted woman, fully clothed, doing yoga poses. There is a joke with these pictures which asks whether the grass the woman is

posing on needs to be cut. This e-mail was noted above at Paragraph 67(*o*). This e-mail was sent to the Respondent by B.M. the Respondent saw the e-mail because he responded to it. It was not included on the November 5, 2014 disc. This e-mail was sent on Saturday, December 21, 2013.

xliv. A picture of a nude woman driving a convertible BMW. There is a joke about the car's "airbags" functioning, but not its air conditioning. This e-mail was sent to the Respondent by B.M.. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, April 30, 2014.

### ADDENDUM E

E–Mails Received By The Respondent At His "John Smith" E–Mail Account

i. A "demotivational picture" entitled "Guys Night Out—there is no way that this could end poorly," with a picture of Ben Roethlisberger and Tiger Woods. The humor is obviously due to the accusations women made against them. This picture was forwarded by Attorney McGowan. This was not included in the November 5, 2014 disc. This e-mail was sent on Monday, May 3, 2010.

ii. A video clip of a beer commercial where a man is seen furiously brushing his teeth and swishing mouthwash, the clip says "earlier..." and cuts to a group of friends drinking. One says, "Can I have another light beer?" The man who was seen brushing his teeth says, "If this is light beer, I'll suck Bill's co-" and his statement is interrupted with the advertisement for Big Rock Beer Company. This clip was forwarded by Attorney McGowan. This was not included in the November 5, 2014 disc. This e-mail was sent on Tuesday, March 30, 2010.

iii. A video clip of a scene from the motion picture "Say It Isn't So," showing the sister of one of the main characters defiantly showing off her pierced nipples to her family. This e-mail was noted above at Paragraph 28(a). This clip was forwarded by Attorney McGowan, and it was included in the November 5, 2014 disc. This e-mail was sent on Thursday, April 8, 2010.

iv. A video clip of a car commercial for Mercedes Benz highlighting two unfaithful couples; the tagline of the commercial is "at least there's one thing you can rely on." This e-mail was forwarded by Attorney McGowan, and it was not included in the November 5, 2014 disc. This e-mail was sent on Friday, August 27, 2010.

v. A video clip entitled "The craziest white man ever," which appears to be a satirical video of a white man picking up Hispanic individuals at a Home Depot and offering them work at his home, but he ends up taking them to the Immigration and Customs Enforcement office. In the video, the man uses racial and ethnic slurs such as "beaner" and "wetback." This video was forwarded to the Respondent by Attorney McGowan and it was not included in the November 5, 2014 disc. This e-mail was sent on Tuesday, June 15, 2010.

vi. A joke about a man taking a woman out to eat at an expensive restaurant, where the woman eats a lot of expensive items on the menu. The man asks. "Does your mother feed you like this when you eat at home?" The woman responds, "No, but my moth-

er is not expecting a blow job." This e-mail was forwarded by Attorney McGowan. It was not included in the November 5, 2014 disc. This e-mail was sent on Wednesday, April 6, 2011.

vii. A series of pictures of strange looking and strangely-attired people getting married entitled "the people of Walmart weddings." This e-mail was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, March 29, 2010.

viii. A "demotivational" poster of a young girl smiling eerily at the camera while a house in the background of the shot burns. The tagline says "Girl Scouts—Maybe next time you'll buy the fucking cookies." This e-mail was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, November 1, 2010.

ix. A series of pictures entitled "girls you can't take anywhere." This series of pictures are of women, fully clothed, generally engaged in sexually-suggestive poses with statues, signs, and other inanimate objects. This e-mail was noted above at Paragraph 28(h). This e-mail was sent to the Respondent by Attorney McGowan. It was included on the November 5, 2014 disc. This e-mail was sent on Saturday December 4, 2010.

x. A video clip called "Happy Ending Massage." This e-mail was noted above at Paragraph 28(i). This video clip is a joke clip where, after a man receives a massage from a female Asian masseuse in a bikini, she asks if he wants a "happy ending," impliedly, a sexual favor. He responds "yes," and balloons and clowns fill the room as if it was a birthday party. This e-mail was sent by Attorney McGowan to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Monday, May 10, 2010.

xi. A picture entitled "If she hasn't yet, she will soon..." The picture is a shot of a woman squatting to relieve herself in the African veldt with a lioness stalking her (at the same time) in the background of the photo. This e-mail was sent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, August 31, 2010.

xii. A joke entitled "instant spark," which implies that a man tasered a "beautiful woman" who he saw in a park and then raped her. This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, December 20, 2010.

xiii. A joke picture of a baby doll in traditional Islamic garb. The punchline of the joke is "Nobody knows what the hell it says 'cause no one's got the balls to pull the cord!" This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, September 8, 2011.

xiv. A joke entitled "Leroy's Hearing Problem," wherein "Leroy" asks a Preacher to pray for help with his hearing, the preacher prays and asks how his hearing is, and Leroy

says, "I don't know, Reverend, it ain't till next Wednesday." This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, March 24, 2010.

xv. A joke about a "magic green hat" that cleared out an emergency room. The hat was a U.S. Customs and Border Patrol hat, implying that the emergency room was full of illegal immigrants. This e-mail was sent by Attorney McGowan. It was not on the November 5, 2014 disc. This e-mail was sent on Friday, February 18, 2011.

xvi. A joke about a woman golfer who fails at golfing and kills a man. The woman says, "I guess all those fucking lessons I took over the winter didn't help." One of the men in the all-male crowd responded "Well, there you have it. You should have taken golf lessons instead!" This e-mail was sent by Attorney McGowan. It was not included in the November 5, 2014 disc. This e-mail was sent on Friday, May 13, 2011.

xvii. A joke about a marriage counselor who asks a couple what they both have in common. The husband responds, "Well, for starters, neither one of us sucks dick." This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Friday, August 6, 2010.

xviii. A joke entitled "Men Should Never Do Advice Columns." In the joke, a woman writes a male advice columnist with a story of her broken down car and how it led her to discover that her husband was cheating. The advice column writer responds with advice as to why her car broke down. This e-mail was sent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, April 19, 2011.

xix. A joke entitled "mother of all," where two Muslim women reminisce about their children. At the close of the joke, one woman says "they blow up so fast, don't they?" This e-mail was sent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, March 25, 2010.

xx. A video clip of a man who takes his new girlfriend fishing on his Nitro speed fishing boat, but then ejects her from the boat after she complains. The girlfriend does not die. This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, April 15, 2010.

xxi. A series of pictures entitled "Prom Night at Camden High School." The pictures are predominantly of black students in prom attire that would generally be considered unusual. This e-mail was sent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, May 19, 2010.

xxii. A video clip of a dog pulling a chicken into its dog house and mounting the chicken. The clip is entitled "Roethlisberger's dog." This e-mail is an evident reference to the rape allegations against Ben Roethlisberger. The e-mail was sent by Attorney McGowan to the Respondent. It was not included on

the November 5, 2014 disc. This e-mail was sent on Monday, April 26, 2010.

xxiii. A video clip of a man lying on the couch watching TV, who has a remote controlled refrigerator. He sends the remote controlled fridge to his girlfriend, and asks her to get him a beer. The tagline is "When your lady friend can't get to the fridge, get the fridge to your lady friend." This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, March 9, 2011.

xxiv. A series of pictures entitled "New Female Wal-Martians." These pictures are mainly of obese women in ill-fitting clothing in Wal–Mart. This e-mail was sent by Attorney McGowan to the Respondent. This e-mail was not included on the November 5, 2014 disc. This e-mail was sent on Monday, February 14, 2011.

xxv. A video clip of a UPS man delivering a package to a woman's home. The woman, who is nude, is visible from behind. When she approaches the door, the UPS man opens the mail slot and says "Hey curly, is your mom home?" The woman runs away. This e-mail was noted above at Paragraph 28(s). The e-mail was sent by Attorney McGowan to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Wednesday, October 20, 2010.

xxvi. A two-picture series entitled "Vibrator warning." The first picture attempts to warn women against using a corn cob for a vibrator.

The second picture is of a topless woman with her legs spread, with her genital area entirely covered by popcorn. This e-mail was noted above at Paragraph 28(t). This e-mail was sent by Attorney McGowan to the Respondent. It was included on the November 5, 2014 disc. This e-mail was sent on Monday, June 21, 2010.

xxviii. A joke video entitled "Mohammed Brand Condoms," which indicates that jihadists should wear the condoms so they do not have to worry about the sexual pasts of their goats. This e-mail was sent by Attorney McGowan to the Respondent. It was not included on the November 5, 2014 disc. This e-mail was sent on Monday, August 16, 2010.

xxiv. A joke picture of the "Home Alone" movie poster. In it, the robber's face behind Macaulay Culkin is replaced with a smiling Jerry Sandusky. This e-mail was sent by C.K.P., an e-mail contact of Attorney McGowan, to Attorney McGowan, the Respondent, and a number of other recipients. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, December 21, 2011.

xxv. An e-mail with the phrase "Jerry Sandusky as Santa Claus with a crying baby boy on his lap..." This e-mail was sent by J.M.C, an e-mail contact of Attorney McGowan, to Attorney McGowan, the Respondent, and a number of other recipients. It was not included on the November 5, 2014 disc. This e-mail was sent on Wednesday, December 21, 2011.

 

xxvi. A series of pictures purporting to be Houston Oilers player Mike Comrie proposing to his girlfriend. The last picture appears, from behind, to be Comrie's girlfriend performing oral sex on him, although the viewer cannot see anything other than her head in his lap. The series is called "How to propose to your girlfriend—as demonstrated by Oilers' Mike Comrie." This e-mail was sent to the Respondent, Attorney McGowan, and a number of other recipients by P.T., an e-mail contact of Attorney McGowan. This picture was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, March 4, 2010.

xxvii. A picture of an obese nude woman wearing a pig costume entitled "How to tell if your house is infected with the swine flu." The e-mail was noted above at Paragraphs 28(j) and 28(mm). The e-mail was sent by E.S., an e-mail contact of Attorney McGowan, to Attorney McGowan, the Respondent, and a number of other recipients. This e-mail was included on the November 5, 2014 disc. This e-mail was sent on Friday, May 15, 2009.

xxviii. A joke entitled "sex in the shower." The joke states that, "in a survey 86% of inner city residents (almost all of whom are registered democrats) said that they have enjoyed sex in the shower. The other 14% said that they have not been to prison yet." This joke was sent to the Respondent, Attorney McGowan and many other recipients by P.T. It was not included on the November 5,

2014 disc. This e-mail was sent on Thursday, December 18, 2008.

xxix. A two-picture series of pictures entitled "for a dreary day," which are of a wrecked golf cart and a large breasted woman in a bikini top. This e-mail was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Thursday, January 3, 2013.

xxx. A two-picture series entitled "Difference between Ravens/SF fans;" the first picture is of a woman in a Ravens' football jersey exposing her breasts to the camera. The second picture is two male San Francisco fans in a bar kissing each other. This e-mail was sent to the Respondent by Attorney McGowan. It was not part of the November 5, 2014 disc. This e-mail was sent on Tuesday, February 5, 2013.

xxxi. A photograph/joke combination entitled "Wife's First Hunt;" the picture is of a woman hunting in a hat with antlers on it. The joke describes the hat as the "first timer's lucky hat." The obvious implication is that the husband wanted the wife to get shot by mistake because of the hat. This e-mail was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, November 26, 2013.

xxxii. A photograph/joke combination that is entitled "Howard was always slow!" The picture is of a nude woman, on a couch, with a skeleton between her legs, apparently performing oral sex on her. There is a word balloon that says "Come on Howard, you're taking

forever!" This e-mail was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Saturday, April 20, 2013.

xxxiii. A link to a YouTube video entitled "Kodak Moment" or "How Not To Instagram." The video is of two women in a swamp. One of the women was taking "selfies" of herself by the water when she is eaten by an alligator or a crocodile. This link was sent to the Respondent by Attorney McGowan. It was not included on the November 5, 2014 disc. This e-mail was sent on Tuesday, November 12, 2013.

xxxiv. A picture slide show entitled "Morning Funnies" or "All men are the same," which shows pictures of small children ogling women's breasts. One photograph has a picture of a woman on a nude beach with a baby sitting next to her grabbing one of her nipples, and one photograph has a small child putting the breasts of an unclothed Barbie doll in his mouth. This e-mail was noted above at Paragraph 28(m). It was sent to the Respondent by Attorney McGowan. It was included on the November 5, 2014 disc. This e-mail was sent on Wednesday, July 29, 2009.